IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRADFORD TECHNOLOGIES, INC, | No. C 11-04621 EDL |
| Plaintiff, | **ORDER REGARDING FURTHER SANCTIONS** |
| v. | |
| NCV SOFTWARE.COM, et al., | |
| Defendants. | |

Pending before the Court is Defendants' request for terminating, monetary, and evidentiary sanctions. The sanctions issue arises from Plaintiff's president's (Jeff Bradford) and its counsel's (Roger Wintle) admitted breach of a Stipulated Protected Order ("SPO"). Attorney Wintle turned over Defendants' "attorney's eyes only" source code to Bradford, who viewed it. On December 6, 2013, the Court entered a stipulated order sanctioning Plaintiff in the amount of $96,939.27 for violating the SPO. (Dkt. 131.) The Court deferred ruling on Defendants' request for terminating or additional sanctions pending expedited discovery on the extent and impact of Plaintiff's use of Defendants' source code, which has now been completed. (Dkt. 132.)

The parties briefed the issue of further sanctions, and the Court held a hearing on June 25, 2013. At this hearing, the Court indicated that terminating sanctions were not warranted but that additional monetary sanctions were. The Court also noted that evidentiary sanctions may be appropriate at trial. After the hearing, Defendants requested a written ruling regarding sanctions.

## II. Background

Plaintiff brings this case against Defendants for, among other things, breach of contract and misappropriation of trade secrets. Plaintiff alleges that Defendant Biggers worked as a computer programmer for Plaintiff, the developer of ClickForms and CompCruncher appraisal software, from

approximately 2007 to 2009. After Biggers was terminated, Plaintiff claims to have discovered another software product on the market, Canvas, that was very similar to a version of CompCruncher that Biggers participated in developing during his employment with Plaintiff. Plaintiff's lawsuit followed.

In February 2012, the parties' counsel began negotiating a Stipulated Protective Order ("SPO") in preparation for a mediation. Plaintiff's president, Jeff Bradford, signed an "Agreement to be Bound by the Stipulated Protective Order" on April 3, 2012. (Sneddon Decl. Ex. K, Dkt. 72-2.) The Court entered the SPO in late May 2010. (Dkt. 55.) The SPO provided that material designed Highly Confidential could not be shared with an opposing party or its officers. (Id.)

After Defendants transmitted their source code to Plaintiff's counsel Roger Wintle via compact disc, Wintle gave the source code discs to Bradford in a sealed Federal Express envelope. (10/29/12 Bradford Decl. ¶ 18, Dkt. 83.) According to Bradford, he obtained the discs so that he could deliver them to Blackbag Technologies for analysis. (Id. ¶¶ 15-17.) Bradford states that he did not deliver the source code disc to Blackbag because he subsequently learned that they did not perform software analysis. (10/29/12 Bradford Decl. ¶ 18.) Instead, Bradford states, he retained the unopened FedEx envelope. (Id. ¶ 19.)

After several postponements, the parties scheduled a mediation for October 12, 2012. At the mediation, the parties were going to exchange expert comparisons of the parties' source code. Prior to the mediation, Bradford asked Mark Linne, one of Plaintiff's officers, to put together a document comparing the user interface elements of Plaintiff's CompCruncher and Defendants' Canvas applications for the mediation. (Supp. Sneddon Decl. Ex. D, Linne Dep. at 28.) Linne created a comparison PowerPoint that compared screenshots of the two applications. (Id. at 28-29; 6/4/13 Linne Decl. ¶ 6.) According to Linne, at no time did he have access to the Canvas source code, and he had no training in source code. (10/29/12 Linne Decl. ¶ 3; 6/04/13 Linne Decl. ¶ 4.)

On October 9, 2012, not having hired any expert to analyze the Canvas source code, Bradford decided to look at the Canvas source code himself to see if it contained any of Plaintiff's source code. (10/29/12 Bradford Decl. ¶¶ 22-23.) When Bradford went to look at the Canvas source code, he realized that the zip files on the discs were password protected and emailed Wintle for the

2

password. (2d Supp. Sneddon Decl. Ex. F.) Wintle responded with the password for the source code, and Bradford used it. (Supp. Sneddon Decl. Ex. C, Bradford Dep. at 66.) Bradford looked at Canvas code for approximately two hours. (Id. at 79.) Bradford also copied the Canvas source code from the disc to his computer. (Id. at 81-82.) According to Bradford, he had to copy the Canvas source code files to open it and examine it. (Id.; 6/4/13 Bradford Decl. ¶ 15.)

Bradford examined the code using the Beyond Compare software and a Delphi program environment. (Supp. Sneddon Decl. Ex. C, Bradford Dep. at 77, 79.) According to Bradford, he did not transfer the Canvas source code file to any other location on his computer or a USB storage device or an external hard drive. (Supp. Sneddon Decl. Ex. C, Bradford Dep. at 82.) Bradford claims he returned the discs to Wintle the next day. (10/29/12 Bradford Decl. ¶ 37.)

At the October 12, 2012 mediation, Defendants learned for the first time that Wintle violated the SPO by delivering the highly confidential discs to Bradford. Bradford states that Defendants' counsel verbally demanded that Bradford return all the discs and delete any copies that he might have made. (6/4/13 Bradford Decl. ¶ 8.) Defendants' counsel strongly deny that they ever made such a demand to Bradford. They further deny that they were ever in the same room as him at the mediation. (2d Supp. Sneddon Decl. ¶ 8.)

Immediately after the mediation, Defendants' counsel Sneddon emailed Wintle and, among other things, demanded that Wintle advise his clients to "preserve all documents in their possession, custody or control relevant to this lawsuit, including any and all documents . . . pertaining to their access to my clients' source code and their 'analysis' of the two programs." (Supp. Sneddon Decl. Ex. A.) Defendants reiterated their preservation request in their motion for sanctions filed October 12, 2012. (Dkt. 70 at 20.)

On October 17, 2013, Defendants filed counterclaims against Plaintiff for misappropriation of trade secrets, intentional interference with prospective economic advantage, unfair competition and injunctive relief, premised in part on Bradford's violation of the SPO. (Dkt. 76.) Among other things, Defendants sought the return of the source code discs.

On October 18, 2013, this Court set a briefing schedule for sanctions and ordered Plaintiff's counsel to "immediately return the three source code disks in question to Defendant's counsel,

3

destroy any electronic or hard copies of the disks generated therefrom, and preserve all data, source code and documents derived in any way from the disks in question or the data contained on those disks." (Dkt. 81.) The Court further ordered both parties "maintain in place an appropriate litigation hold on all documents related to the claims and counterclaims at issue in this lawsuit, including but not limited to their respective evaluations of the other side's code." (Id.) On October 24, 2012, Plaintiff returned the discs to Defendants. (Stip. Sanctions Order at ¶ 4, Dkt. 131.)

Around the time that Plaintiff returned the discs, Bradford deleted the Canvas source code from his computer by putting the Canvas source code files in the trash bin on his desktop and then emptying it. (Supp. Sneddon Decl. Ex. C, Bradford Dep. at 83.) Bradford testified that he deleted those files because he was instructed to do so, but he could not remember who told him to delete the source code files. (Id. at 97-98.) Bradford further testified that he preserved the comparison documents he created when he looked at the Canvas source code. (Id. at 99.)

Meanwhile, Mark Linne was in the process of wiping his work-issued laptop clean. In a striking coincidence, according to Linne's June 2013 declaration, he notified Bradford verbally immediately after the mediation that he was going to leave Plaintiff's employ. (6/4/13 Linne Decl. ¶¶ 7, 8.) Linne claims that he had decided to move on prior to the mediation. (6/4/13 Linne Decl. ¶ 7.) Because he used this work laptop in developing a new business, he wanted to prevent Plaintiff from accessing this "private and confidential information." (Id. ¶ 9.) Consequently, when Linne returned to Colorado after the mediation, he took his laptop to Staples and had the hard drive wiped. (Id. ¶ 10.) Linne claims, both in his declaration and in his deposition testimony, that he had not seen or heard of the Litigation Hold Memorandum or Sneddon's October 12, 2013 preservation request. (Id. ¶ 10; Supp. Sneddon Decl. Ex. D, Linne Dep. at 30-31.) Because of Linne's actions, Plaintiff could not produce the PowerPoint presentation Linne created for the October 12, 2012 mediation, despite attempting to forensically recover it. (Supp. Sneddon Decl. Ex. F.)

On November 30, 2013, Wintle circulated a litigation hold memo to Defendants' counsel. (Supp. Sneddon Decl. Ex. B.) There is no evidence, however, that Wintle circulated this memorandum to Plaintiff's employees. Bradford testified that he believed it was circulated, but he cannot recall when it was sent or who sent it. (Supp. Sneddon Decl. Ex. C, Bradford Dep. at 95-96.)

4

As noted above, on December 6, 2012, the Court entered the parties' stipulated sanctions order and ordered Plaintiff to pay Defendants $96,939.27. (Dkt. 131.) The parties stipulated that Plaintiff and Bradford willfully violated the SPO by taking possession of and reviewing the Canvas source code. The order required Plaintiff to circulate a litigation hold memo, enjoined Bradford from possessing and viewing any of Defendants' source code discs or code derived therefrom, and provided for expedited discovery regarding what Bradford did with the Canvas source code. The stipulated sanctions order also required Bradford to declare that he had not retained any copies of Defendants' source code. (Id. ¶ 2h.)

Additionally, the stipulated sanctions order, like the Court's previous order, required Plaintiff, Bradford, and Wintle to preserve relevant evidence. Specifically, they were to preserve "all documents in their possession, custody, or control relevant to this lawsuit, including without limitation any and all documents, emails, electronic files and other information pertaining to their access to Defendants' source code and other trade secrets including BTI and Mr. Bradford's analysis of Defendants' source code and any disclosure, copying, or use of that source code." (Id. ¶ 5.)

On December 7, 2012, Bradford served on Defendants the required declaration. (Supp. Sneddon Decl. Ex. E, 12/7/12 Bradford Decl.) Bradford stated, among other things, that he "individually and on behalf of BTI and AppraisalWorld have not retained any copies of Defendants' source code." (Id.)

The Court issued another order on January 4, 2013. The Court deferred ruling on the terminating sanctions until the completion of discovery "on the extent and impact of Plaintiff's use of Defendants' source code in violation of the SPO." (Dkt. 132.)

From this point through June 2013, Defendants engaged in discovery regarding Bradford's use of Canvas source code. Bradford continued to use his laptop, and the only step he took to preserve the evidence on the laptop was not to delete the files on it. (Supp. Sneddon Decl. Ex. C., Bradford Dep. at 98.) Because Bradford was still using his laptop, Defendants were not able to arrange for forensic imaging of the laptop until January 21, 2013 at 1:00 p.m. (Supp. Sneddon Decl. ¶ 5.) At his deposition, Bradford testified that he could not remember doing anything unusual with his laptop on January 21, 2013. (Id. Ex. C, Bradford Dep. at 99-102.)

After forensic imaging, Defendants' expert Donald Vilfer prepared a report. (Id. Ex. H, Vilfer Rep.) In sum, Vilfer opined that:

> Based on the above we have concluded that the CANVAS Source Code disk had been accessed using this computer, that they were copied and saved and tools were used to analyze the code of the proprietary software. No full copies of the software were found to have remained on the computer, but we did locate portions of the code saved out to documents using code comparison software. This means that evidence of the use of the CANVAS Source Code was deleted, along with the proprietary files, virtually eviscerating our ability to assess whether further actions were taken with respect to the CANVAS Source Code files. Even with the files having been deleted, we could have gleaned information from the files in the recycle bin but for the fact that the recycle bin was emptied just prior to our arrival to acquire the forensic image. Additionally, over 1,200 files were modified the morning we acquired the forensic image and 29 were deleted that morning.
>
> Some action was also taken with the laptop to cause an update to all the Windows registry keys and subkeys related to USB devices so that they all reflected a last written date and time of 1/21/2013 at 10:18 AM, just a few hours before the forensic imaging. This hampers our ability to ascertain if the CANVAS Source Code files were copied to any of those devices.

(Id. at 12.) Plaintiff submitted a rebuttal report by their expert, Sandeep Chatterjee.

After the parties fully briefed the issue of whether additional sanctions were warranted, the Court held a hearing and indicated that terminating sanctions were not appropriate but that a further monetary award for the expenses entailed in the expedited discovery was and that evidentiary sanctions may be appropriate if raised at an appropriate time. The Court ordered the parties to file a joint statement regarding monetary sanctions and mediation. After the parties filed their joint statement, in which Defendants' requested a written order, the Court set forth a procedure for discovery in advance of mediation. (Dkt. 165.)

### III. Discussion

#### A. Terminating Sanctions

Defendants argue that terminating sanctions are warranted because discovery has revealed that not only did Wintle and Bradford violate the SPO by transmitting and reviewing Defendants' Canvas source code, but Plaintiff has also violated the Court's sanctions order by willfully and in bad faith modifying and destroying evidence. (Supp. Mem. at 16.) Defendants also assert that Plaintiff has lied to this Court on multiple occasions. (Reply Mem. at 2.)

The Ninth Circuit employs a multi-factor test when considering case-dispositive sanctions

under Rule 37(b)(2): "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. . . . The sub-parts of the fifth factor are whether the court has considered lesser sanctions, whether it tried them, and whether it warned the recalcitrant party about the possibility of case-dispositive sanctions." Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills, 482 F.3d 1091, 1096-1097 (9th Cir. 2007). The Ninth Circuit has cautioned that this test is not mechanical, but instead "provides the district court with a way to think about what to do, not a set of conditions precedent for sanctions or a script that the district court must follow." Id. "What is most critical for case-dispositive sanctions, regarding risk of prejudice and of less drastic sanctions, is whether the discovery violations 'threaten to interfere with the rightful decision of the case.'" See Valley Eng'rs v. Elec. Eng'g Co., 158 F.3d 1051, 1057 (9th Cir. 1998) (quoting Adriana Intl. Corp. v. Lewis & Co., 913 F.2d 1406, 1412 (9th Cir.1990)). The court considers the same factors regarding terminating sanctions under its inherent powers that it considers in the Rule 37 context. Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 348 (9th Cir. 1995).

Although it is a close issue, the Court does not find terminating sanctions to be appropriate in this case. As in most cases, the first and second factors favor terminating sanctions, and the fourth and fifth factors disfavor them. The key, then, is whether there is evidence that Defendants' have suffered any prejudice due to Plaintiff's conduct. Defendants have not produced any evidence of prejudice. There is no evidence that Plaintiff used Defendants' source code in its own products. The reason the Court ordered expedited discovery in the first place was to determine whether Defendants were correct in their suspicion that Plaintiff gained a commercial advantage by using Defendants' source code to upgrade its commercial software products. (Dkt. 132 at 1.) Defendants point out that they cannot tell with complete certainty what Bradford did with the source code because he deleted the source code from his laptop. While Bradford's sloppiness regarding preservation is itself sanctionable and made it impossible to know exactly what he did, Defendants' discovery has not produced any evidence that Plaintiff incorporated Defendants' source code into any of Plaintiff's products – a result that would be difficult to hide even if the intervening steps taken to do so were

erased.

Further, in hindsight, the orders requiring Plaintiff to preserve all evidence regarding the source code could have been clearer insofar as they required Plaintiff to preserve evidence while at the same time ordering Plaintiff to return discs and delete source code, as Defendants requested. This arguable ambiguity militates against dismissal. This is not to say that the Court's orders were inconsistent, or that Plaintiff should not have carried out both duties simultaneously or, at minimum, sought clarification from Defendants or, if necessary, the Court. As Defendants point out, Plaintiff could have hired a forensics firm to take an image of Bradford's laptop and then permanently delete the source code. Alternatively, Plaintiff could have decommissioned the laptop, removed the hard drive, and delivered it to a third party for safekeeping. (Supp. Mem. at 19 n.89; Reply Mem. at 6 n.19.) Moreover, Plaintiff should have at least sought clarification before deleting significant evidence in the face of multiple orders requiring preservation.

Nevertheless, because there is no evidence of source code theft, and because there was some arguable ambiguity in the preservation orders, the Court will not issue the ultimate sanction of dismissal.

B. Other Sanctions

The Court will, however, order sanctions short of dismissal. The expedited discovery has adduced evidence that Plaintiff, Bradford, Linne, and counsel were derelict in their duty to preserve evidence and that Bradford has made inconsistent representations to the Court. Bradford deleted Defendants' source code from his computer despite two Court orders emphasizing the need to preserve relevant evidence. There is no question that the source code Bradford viewed on his laptop was relevant to his "copying or use" of that very source code. Plaintiff also made no effort to preserve the state of the evidence on Bradford's laptop after the mediation or otherwise quarantine the laptop's hard drive. Bradford's vague and self-serving testimony that someone told him to delete the source code, but he cannot recall who did so, is not persuasive; more persuasive is Defendants' counsel's declaration that neither she nor her colleague instructed Bradford to delete any source code. Because Bradford deleted the source code from his laptop, Defendants cannot ascertain exactly what he did with it. This is carelessness at best and spoilation at worst.

8

Plaintiff's failure to notify Linne of his preservation obligations and circulate the Litigation Hold memo to him, if true, is further evidence of Plaintiff's sloppiness. The timing of Linne's wiping his hard drive is itself suspicious. Although there is reason to believe that the PowerPoint Linne created did not involve Defendants' source code,[1] Linne conceded that he deleted it after the after the October 12, 2012 mediation for what he described as a coincidence of purely personal reasons. It troubling to accept that Linne, an executive vice president at Plaintiff, did not receive or did not notice the Litigation Hold memo that Plaintiff was ordered to circulate or that he was not otherwise made aware of the Court's preservation orders. Either Linne was never notified of his preservation obligations, or he ignored them. Either situation is inexcusable.

There is also evidence that Bradford's laptop was modified just hours before Defendants' expert was scheduled to examine it. (Supp. Sneddon Decl. Ex. H, Vilfer Rep.) Namely, (a) the recycle bin was accessed and modified (id. at 6); (b) 29 files were deleted (id. at 8); (c) 1,200 files were modified but not accessed (id. at 10); and (d) the registry keys and subkeys for USB storage devices all showed that date as the last written time, preventing Defendants' expert from determining whether Canvas files were copied to those devices (id. at 9). Plaintiff disagrees with the significance of these facts and supplies a declaration from its own expert rebutting portions of Defendants' expert's opinions, particularly regarding USB devices. (6/4/13 Wintle Decl. Ex. B, Chatterjee Rep.) Notwithstanding this disagreement, Plaintiff does not dispute that certain files were deleted and that something caused the registry keys to show the same information. While there may be innocent explanations for these changes, Plaintiff's failure to preserve Bradford's laptop intact despite knowing that it was about to be examined is more evidence of Plaintiff's cavalier disregard of its obligations to preserve evidence related to Defendant's source code.

Not only has Plaintiff disregarded its duty to preserve evidence relevant to the source code issue, but Bradford seems to have been overly casual as to his duty of candor to the Court. Bradford

---

[1] Linne testified that the PowerPoint he created compared the user interface of the CompCruncher application with the user interface of a freely available Canvas application; it did not compare source code. (Supp. Sneddon Decl. Ex. D, Linne Dep. at 28-29; 6/4/13 Linne Decl. ¶¶ 5-6.) Linne also avers that Attachment I to the Vilfer Report is a report that he developed and converted into the missing PowerPoint. (6/4/13 Linne Decl. ¶ 12.) This document does not contain Canvas source code, but instead focuses on the appearance and functional aspects of the Canvas application. (Supp. Sneddon Decl. Ex. H, Vilfer Rep. Attach. I.)

9

averred in his October 29, 2012 Declaration that he did not save or copy any information from the source code disc. At his deposition during the expedited discovery phase, however, he testified that he did copy Defendants' source code software to his computer. (Supp. Sneddon Decl. Ex. C, Bradford Dep. at 81). Bradford does not address this discrepancy directly but rather insists that he had to copy or save the source code files to his computer in order to use them for his review. (6/4/13 Bradford Decl. ¶ 15.) Bradford suggests that he thought "copying" meant making an image of the source code and then using it someplace else. (6/25/13 Hr'g Tr. at 6, Dkt. 164.) The Court finds it difficult to reconcile Bradford's declaration with his deposition testimony.

Additionally, when Bradford agreed to be bound by the SPO, he certified that he read and understood the SPO. (Sneddon Decl. Ex. K.) At his deposition, however, Bradford testified that he never saw the full protective order. (Supp. Sneddon Decl. Ex. C, Bradford Dep. at 71.) Not reading a protective order is no excuse for later violating the protective order when one certifies that one has read it. It is in fact the opposite of an excuse. The Court may well allow Bradford's credibility to be impeached at trial regarding whether he saved and copied Defendants' source code and whether he read and violated the SPO.

The Court will also make an additional monetary award of the reasonable expenses that Defendants incurred in taking expedited discovery regarding Plaintiff's use of Defendants' source code, but excluding those that Defendants incurred in pursuit of their counterclaims. Consistent with the Court's July 29, 2013 Order (Dkt. 165), the parties' should notify the Court by August 12, 2013 whether they can resolve the amount of monetary sanctions. Further, neither Plaintiff nor any expert whom Plaintiff retains may rely on any code comparison documents Bradford created using Defendants' source code, nor may Plaintiff or any expert whom Plaintiff retains rely on the PowerPoint created by Linne.

## IV. Conclusion

In light of Plaintiff's conduct, the Court finds that additional sanctions are warranted as set forth above.

**IT IS SO ORDERED.**

Dated: Aug 6, 2013

ELIZABETH D. LAPORTE
United States Magistrate Judge